**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DANIEL J. HARTUP** | § | |
| | § | |
| **Plaintiff,** | § | **Cause No. 3:08-CV-197-O** |
| | § | |
| **v.** | § | |
| | § | |
| **AMERICAN STANDARD, INC. d/b/a** | § | |
| **TEXAS OKLAHOMA TRANE,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**
**ON MOTION FOR SUMMARY JUDGMENT**

Before the Court are Defendant's Motion for Summary Judgment (Doc. #23) and Brief/Memorandum in Support (Doc. #24), Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. #28) and Brief/Memorandum in Support (Doc. #30), Supplemental Document by Daniel J. Hartup as to Brief in Support of Summary Judgment (Doc. #35), Defendant's Reply in Support of Summary Judgment (Doc. #40), and the attendant appendices (Docs. ##25, 29).

For reasons discussed below, Plaintiff's Motion for Summary Judgment is **GRANTED**.

I.       **BACKGROUND**

**A. The American with Disabilities Act**

The Americans with Disabilities Act ("the ADA;" "the Act") was passed in 1990 to counter discrimination committed against persons because of their real or perceived disabilities. 42 U.S.C. § 12101(a). The Act covers a broad range of activi-

ties in seeking to secure access to the fullness of daily life for the disabled. 42 U.S.C. § 12101(b). Congress found that persons with real or perceived disabilities had tended to be relegated to the shadows and back rooms of life, solely out of prejudicial discomfort with their presence. 42 U.S.C. § 12101(a).[1] Indeed, during the 19th century legislation sought to institutionalize rather than assure opportunities to the disabled. Note: *A Progression Toward Freedom: Protecting the Disabled Under the Ku Klux Klan Act,* 20 Cardozo L. Rev. 1019, 1024-1028 (1999); *see also* Jonathan C. Drimmer, *Cripples, Overcomers, And Civil Rights: Tracing The Evolution Of Federal Legislation And Social Policy For People With Disabilities,* 40 UCLA L. Rev. 1341, 1347-1359 (1993). The ADA sought to remedy the effects of that lingering bigotry. 42 U.S.C. § 12101(b).

Proper analysis of the ADA's employment provisions can produce results that seem paradoxical or counter-intuitive. Accordingly, the Court turns first to a history of disability-related legislation as guidance in understanding this decision.

### 1. Equality of access and the ADA

The ADA's employment provisions are a small part of the Act itself. *Compare* 42 U.S.C. §§ 12101–12117 *with* 42 U.S.C. §§ 12131–12213. Together with state and local legislation,[2] the ADA has encouraged a culture in employment, health care, and

---

[1] See also, Catherine Ipsen, *Secondary Conditions and Employment Outcomes for Adults with Disabilities*, J. DISABILITY POL'Y STUD. (2006); Dennis Gilbride, Robert Stensrud, Connie Ehlers, Eric Evans, Craig Peterson, *Employers' Attitudes toward Hiring Persons with Disabilities and Vocational Rehabilitation Services,* J. of Rehabilitation (2000); Robert F. Kilbury, John J. Benshoff, Stanford E. Rubin, *The Interaction of Legislation, Public Attitudes and Access to Opportunities for Persons with Disabilities,* J. of Rehabilitation (1992).

[2] State and local authorities were already moving toward, or had legislated, protections for disabled workers by 1990. "It is probable, therefore, that the lack of notable impact of the ADA on the labor market experience of the disabled implies that, like many other pieces of legislation with a strong social and moral content, it was adopted in an environment that

elsewhere that actively promotes access for the disabled including access to public facilities and transportation. *See, e.g,* LISA I. IEZZONI, BONNIE L. O' DAY, MORE THAN RAMPS: A GUIDE TO IMPROVING HEALTH CARE QUALITY AND ACCESS FOR PEOPLE WITH DISABILITIES (2006).

The driving force behind contemporary disability rights legislation has been what Jacobus tenBroek referred to as "integrationalism," which "called for the full and equal participation in society of persons with disabilities." Peter Blanck, *The Right to Live in the World: Disability Yesterday, Today, and Tomorrow,"* 13 Tex. J. on C.L. & C.R. 367, 368 (2008). In each of its provisions, the Act seeks to provide the disabled those opportunities others take for granted through requiring a modification of relevant structural environments, whether they are related to work or other life activities. *See, e.g.,* Joan Tollifson, *The Perils Of Getting A Driver's License, in* VOICES FROM THE EDGE: NARRATIVES ABOUT THE AMERICANS WITH DISABILITIES ACT, 162-66 (Ruth O'Brien ed., 2004). Access has been the cornerstone of the disability rights movement that brought the ADA into being.[3]

The ADA's corrective mechanisms are consistent with the "equal access" fo-

---

had already embraced its principles and mandates, for the most part. For example, by 1990, every state had adopted some form of legislation granting protection to disabled workers. [Evidence] indicate[s] that these state-level policies had influences on employment, wages, and hours similar to those found when the federal legislation was implemented." *Julie L. Hotchkiss,* THE LABOR MARKET EXPERIENCE OF WORKERS WITH DISABILITIES: THE ADA AND BEYOND, 142 (2003) (Questia, 27 Aug. 2009).

[3] "Access is a multifaceted concept with impacts on every part of daily life. For individuals with disabilities, access can best be understood as the right to participate equally in ways that are not constrained by physical or mental limitations. Access can include entering and maneuvering around buildings, being allowed to actively and meaningfully participate in employment and other social functions, and employing assistive technology to use objects in a manner similar to people without disabilities. Many battles for access have focused on buildings, transportation, communication, and public environments." PAUL T. JAEGER & CYNTHIA ANN BOWMAN, UNDERSTANDING DISABILITY: INCLUSION, ACCESS, DIVERSITY, AND CIVIL RIGHTS 63 (2005) (citation omitted) (Questia, 27 Aug. 2009).

cus of the Act – which is indeed the focus of all disability legislation. The ADA is "widely regarded as the most comprehensive and radical legislation of its kind in the world." Note: *Disabled Meanings: A Comparison of the Definitions of "Disability" in the British Disability Discrimination Act of 1995 and the Americans with Disabilities Act of 1990,* 23 Hastings Int'l & Comp. L. Rev. 149, 152 (1999).

However, the ADA does not remedy on-the-job injuries or require employers to provide jobs-of-choice to persons who suffer from impairments -- unless they can do the job but are denied it because of prejudice against those who are disabled or find themselves suffering from other's belief that they are disabled. The ADA mandates that persons with disabilities have access to the job market on an equal basis with others. Throughout the history of disability legislation, a fair route into the workforce has been regarded as the single most valuable disability right. *See, e.g.,* Elizabeth Clark Morin, *Americans with Disabilities Act of 1990: Social Integration Though Employment,* 40 Cath. U.L. Rev. 189 (1990),

Conduct and construction permitting access to the disabled has been the singular hallmark of federal legislation before and after the ADA. JAEGER & BOWMAN, UNDERSTANDING DISABILITY, 63-94; *see also* Ruth O'Brien, *From a Doctor's to a Judge's Gaze: Epistemic Communities and the History of Disability Rights Policy in the Workplace,* Polity (2003); David Pfeiffer, *Overview of the Disability Movement: History, Legislative Record, and Political Implications,* Pol'y Stud. J. (1993). This is not a limiting artifice erected by "judicial activists" on the foundation of laws rolling back the discrimination against the disabled. It is the foundation itself, in the opinion of disability activists, *see, e.g.,* JAEGER & BOWMAN, UNDERSTANDING DISABILITY 63-94, and in

the letter of the law itself.

The United States began addressing the issue of disability, particularly with an eye toward enabling the disabled to work, upon the return of soldiers whose disabilities resulted from wounds received in national service during World War I. STEPHEN L. PERCY, DISABILITY, CIVIL RIGHTS, AND PUBLIC POLICY: THE POLITICS OF IMPLEMENTATION, 193 (1992) (Questia, 24 Aug. 2009).[4] It has continued to legislate on behalf of the disabled. Access to the job market and to other major life activities has been the guiding star of legislation and regulation.

An examination of federal legislation reveals this focus in:

1) *The Air Carrier Access Act of 1986*, 49 U.S.C. § 41705 (see also 14 CFR Part 382) requires that airlines provide access to the use of the services to the disabled;

2) *The Architectural Barriers Act of 1968*, 42 U.S.C. §§ 4151 et seq. (see also 41 CFR Subpart 101-19.6) requires that any building constructed with federal funds must provide entry and enjoyment access to the disabled;

3) *The Fair Housing Amendments Act of 1988*, 42 U.S.C. §§ 3601 et seq. (24 CFR Parts 100 et seq.) requires that the disabled have full access to the housing markets, whether rental or sale;

---

[4] In part, this was a response to decades of criticism of the poor reaction to the disability-based problems of Civil War veterans. *See* Elna C. Green, *Protecting Confederate Soldiers and Mothers: Pensions, Gender, and the Welfare State in the U.S. South, a Case Study from Florida,* J. Soc. History (2006); Jeffrey E. Vogel, *Redefining Reconciliation: Confederate Veterans and the Southern Responses to Federal Civil War Pensions,* Civil War History (2005); PAUL A. CIMBALA & RANDALL M. MILLER, UNION SOLDIERS AND THE NORTHERN HOME FRONT: WARTIME EXPERIENCES, POSTWAR ADJUSTMENTS, 368-416 (2002). Similarly, the related "war on drugs" started over a half-century after our society sat disquiet in the face of opium addiction among disabled Civil War veterans. Joseph E. Kennedy, *Drug Wars in Black and White,* 66 Law and Contemporary Problems 153 (2003); James Marten, *Exempt from the Ordinary Rules of Life: Researching Postwar Adjustment Problems of Union Veterans,* Civil War History 1 (2001) (Questia, 27 Aug. 2009). Addressing the needs of disabled veterans has consistently been the initial step toward establishing disability rights throughout the world. David A. Gerber, *Disabled Veterans and Public Welfare Policy: Comparative and Transnational Perspectives on Western States in the Twentieth Century,* 11 Transnat'l L. & Contemp. Probs. 77 (2001).

4)   *The Individuals with Disabilities Education Act (IDEA),* 20 USC §1401 et seq. (*see also* 34 CFR Part 300), requires that children with disabilities be educated in the least restrictive environment, so that "all children with disabilities have access to a free appropriate public education," Antonis Katsiyannis, Mitchell L. Yell & Renee Bradley, *Reflections on the 25th Anniversary of the Individuals with Disabilities Education Act,* Remedial and Special Education (2001);

5)   *The Telecommunications Act of 1996*, 47 U.S.C. §§ 255, 251(a)(2), mandates access for the disabled to all aspects of contemporary communication devices and media, including telephones, cell phones, pagers, and operator services that were previously not accessible;[5]

6)   *The Urban Mass Transportation Act of 1964,* as amended, (49 USC 1612) requires that systems accepting federal monies authorized under the Act must make those systems accessible to elderly and handicapped persons; and,

7)   *The Voting Accessibility for the Elderly and Handicapped Act*, 42 U.S.C. § 1973ee et seq., requires that all polling places in federal elections be accessible for elderly and disabled citizens.

Most famously, Sections 501, 503, 504 and 508 of The Rehabilitation Act of 1973 imposed on the federal government as an employer the sort of obligations extended to private employers by the ADA in 1990. See 29 U.S.C. § 791 (see also 29 CFR § 1614.203); 29 U.S.C. § 793 (see also 41 CFR Part 60-741); 29 U.S.C. § 794 and 29 U.S.C. § 794d. Over 100 regulations are attached to federally assisted or conducted programs that promote accessibility to those programs for the disabled as well.[6]

### 2. Accommodation and the ADA

The ADA's notion of "meeting job requirements with or without accommoda-

---

[5] Those with disabilities have rated this one of the more effective measures undertaken on their behalf. Cathy A. Hinton*, The Perceptions of People with Disabilities as to the Effectiveness of the Americans with Disabilities Act,* J. of Disability Pol'y Stud. (2003).

[6] *See, e.g.,* 28 CFR Part 39, 28 CFR §§ 42.501 et seq. (Department of Justice); 34 CFR Part 104 (Department of Education); 45 CFR Part 84 (Department of Health and Human Services).

tion" can be difficult to grasp because generous sentiments often lean against the overall context and the legal writ of the ADA's employment provisions. *See Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996); *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995). Again, the key is that the ADA exists to provide access to all aspects of life, including the job market. "Accommodation" does *not* require modification of the job *requirements* tailoring them to the complainant's particular abilities. *Id.* Accommodation involves modification of the work *environment* in a way that provides the complainant access to meet the job requirements *despite* impairments. *Id.*

A person who can perform a job on the factory line standing up may, for example, develop impairments preventing her from standing for prolonged periods of time. If provision of a stool would accommodate this impairment, enabling her to perform the required work, then that accommodation would fall within the mandate of the ADA. However, "accommodation" under the ADA would not require that others to do her work during periods she needed to sit, or that the job be reconfigured to involve only those tasks she could perform while sitting. Likewise, if an employee can continue to do his job with a simple provision of wheel-chair access to his work station, the ADA protects him from being fired because of his disability.

As detailed below, then, the ADA's protections are meant for those who have the ability to do a job if provided proper accommodation but are denied the job because of a bias against them as persons of real or perceived disability.

**B. Hartup's History with Trane**

On or about November 27, 2007, Defendant American Standard, Inc., which does business as Texas Oklahoma Trane ("Trane"), sent a letter to a long time employee, Plaintiff Daniel J. Hartup ("Hartup"). Trane said Hartup would be fired on December 5, 2007, unless he provided evidence of employability with his work restrictions. This was the final misstep in an odd series of communications between Trane and Hartup after April, 2007, when Hartup attempted to return to work for Trane once again after a substantial number of accommodations and rehires. As will be developed below, Trane actually reached the conclusion that Hartup could not be hired for the only active position[7] that he sought during the late spring / early summer of 2007.[8]

Hartup had taken medical leave for a succession of surgeries seeking correction on non-work related physical difficulties. In April, 2007, he sought to return to Trane, although the surgeries do not seem to have remedied his impairments, as his activity restrictions were identical to those before the surgeries.

Trane, in the meantime, had changed its business model. Trane eventually rejected his bid to return, contending that the position he had occupied had been eliminated (per Trane) or modified (as Hartup would the facts read) in a way that he could no longer meet the job requirements with or without accommodation. Hartup persisted in attempting to regain the same position he had formally held, or another position within Trane, and Trane's refusal to employ him either way led to this law-

---

[7] The evidence that other positions for which he applied were advertised but were never filled is undisputed.

[8] The exact day this decision was taken is not clear from the evidence.

suit.

### 1. Hartup's past positions

As an "HVAC technician," the bulk of Hartup's years with Trane were spent servicing air-conditioning units, including industrial scale units. Hartup Depo. 106:24- 107:5 (P. App. 53-54). Defendant Trane first employed Hartup in April, 1986, as an air conditioning technician, Hartup Depo. 105:24-106: 1 (P. App. 103); P. Aff., ¶ 2 (P. App. 301); *see also,* D. App. 2, 43-44. Hartup later worked for Trane as a salesman of related products, Hartup Depo. 112:3-11; 255:3-7; 277:21-25 (P. App. 56, 128, 139); P. Aff., ¶ 10 (P. App. 303).

### 2. Hartup's initial physical difficulties

Hartup suffered a cervical spine injury while working for Trane in February of 2001, which was in his fifteenth year of employment by Trane. Hartup Depo. 54: 1-2; 251:3-7 (P. App. 22, 126); P. Aff., ¶ 2 (P. App. 301); *see also,* D. App. 2, 35, 103. Hartup had surgery for his injury in October 2001. Hartup Depo. 59: 15-18 (P. App. 30); P. Aff., ¶ 4; (P. App. 302); *see also,* D. App. 2, 36. Prior to that surgery, Defendant accommodated Hartup's physical restrictions by providing assistants to him in the field. Hartup Depo. 110: 15- 111: 14 (P. App. 55-56); *see also,* D. App. 46-47.[9]

After surgery and post-surgical care, Hartup returned to work in January 2002. Hartup Depo. 111:14-22 (D. App. 2, 47); *see also,* P. Compl. 2, ¶ 6. Trane accommodated his work restrictions by using him as an on-scene consultant for other HVAC technicians and office work. Hartup Depo. 121:4-8; 121:25-122:6 (P. App. 61);

---

[9] Hartup received workers' compensation for the injury. D. App. 33-34 (Hartup Depo. 52:13-53:6; 62:13-16; 114:10-19; 276:6-20). That case is now closed. D. App. 81-82 (Hartup Depo. 196:22 – 197:24).

Hartup Depo. 111:23-112:8; 112:25-113:6; 114:25-115:5 (D. App. 47-51); *see also,* P. Compl. 2, ¶ 6. He was not required to exceed certain lifting restrictions or work more hours than his doctors permitted. *Id.*

In March of 2002, Hartup left Trane. Hartup Depo. 147:4-10, 153:9-15,252:19-253:2 (P. App. 74, 77,127); P. Compl. 2, ¶ 6. In deposition testimony, Hartup cited disappointment that he was not accepted for a project manager position. *Id.* He also admitted to concerns that his physical limitations put his co-workers in the field at risk if an emergency situation called for him to lift heavy equipment. Hartup Depo. 132:13-133:4; 145:25-146:13 (D. App. 52-53, 1-3-104). He subsequently studied for, and obtained, a real estate license. Hartup Depo. At 74:6-7 (D. App. 38).

**3. Trane rehires Hartup and accommodates his limitations**

Trane rehired Hartup the following year as a customer sales manager. Hartup Depo. 147:4-10, 153:9-15, 252:19-253:2; Thoele Depo. 9:5-10; 9:22-10:2 (P. App. 74, 77,127; D. App. 3, 64, 104-105, 201-202); *see also,* P. Compl. 3, ¶ 8. He worked for Trane in that capacity from February 2003 through June 2006. Hartup Depo. 253:3-4 (P. App. 127); P. Aff., ¶ 9 (P. App. 302-303). Michael Thoele, his supervisor, testified in deposition that his performance was mediocre and his commission earnings rarely exceeded his draw. Thoele Depo. 30:23 – 31:1; 33:1-11; 41:21-25; 43: 9-20; 45:21-46:1 (D. App. at 203-209).

In May 2006, Hartup complained that the driving component of the outside sales position was causing him neck and back pain by aggravating the lingering effects of the original injury. Thoele Depo. 71:14 - 72:4; P. Aff., ¶ 9 (D. App. 3, 210-212; P. App. 255; P. App. 302-303). Hartup asked Trane to transfer him to another posi-

tion that would accommodate his physical limitations. Hartup Depo. 169:14-170:2; 255:3-7; 277:21-25; (P. App. 85, 128, 139); *see also,* P. Aff., ¶ 9 (P. App. 302-303).

Trane therefore moved Hartup into an inside sales job in June, 2006. Hartup Depo. 112:3-11; 169:14 – 170:2; 255:3-7; 277:21-25 (D. App. 68-69; 107, 114; P. App. 56, 128, 139); *see also,* P. Aff., ¶ 10 (P. App. 303) P. Compl. 3, ¶ 12. Thoele testi-fied in deposition that Hartup could perform the physical aspects of the job despite his restrictions. Thoele Depo. 76:3-6; 77:3-5; P. App.256. Hartup 's work restrictions were: (i) no lifting over twenty-five (25) pounds; (ii) no overhead activities; and (iii) no more than eight (8) hours of work per day. P. Aff., ¶ 14 & P. App. Ex. 6, 17; P. App. 266-70, 289, 304.

Thoele recommended that Hartup take the inside sales job in part because he knew it would accommodate those restrictions. *Id*. Hartup worked at a designated window behind the front customer counter providing parts to Trane field techni-cians. Smith Depo. 115: 15-116: 1; P. App. 234; Mizell Depo. 46:2-11 ; P. App. 185. Another salesperson, Bessie Mizell, helped to train him and assisted him with any lifting that exceeded his work restrictions, together with other employees. Smith Depo. 79:17- 80:17; P. App. 225; Mizell Depo. 49:5-50:4, 78:19-25,102:4-9,102:21-103:8; P. App. 185- 186,193,199; P. Aff., ¶ 11; P. App. 303.

### 4. Hartup's leave for surgeries

Meanwhile, Hartup established a treatment plan with his doctors that in-volved successive surgeries for bilateral lunar nerve transportation and bilateral carpal tunnel surgery. P. Aff., ¶ 10; P. App. 303; P. Compl. 4, ¶ 12.[10] The surgeries

---

[10] Both sides agree this condition was independent of the original injury. P. Aff., ¶ 10, Hartup

were originally scheduled for July 2006, November 2006, December 2006, and February 2007. *Id.* Hartup worked for several weeks from June, 2006, through July 26, 2006, and had the first of these surgeries on July 27, 2006. Hartup Depo. 173:17-25, 178:5-7 (D. App. 3-4, 71, 74); *see also* P. Compl. 3-4, ¶¶ 12-13.

Hartup was medically cleared to work again starting August 14, 2006, although wearing a cast and sling on his "operated arm and splint and pads on his opposite arm with restrictions not to lift anything greater than one (1) pound." P. Compl. 4, ¶ 13; *see also,* Hartup Depo. 181:3-7 (D. App. 4, 75); P. Aff., ¶12 (P. App. 303-304). Trane persuaded him to file for Family Medical Leave Act benefits, followed by long term disability benefits, given the length and effects of the successive surgeries planned.[11] Hartup Depo at 181:20-182:6, 184:19-185:7, 189:8-21; Smith Depo. 19:18-20; Stewart Aff. ¶ 7. (D. App. 4, 75-79, 130, 219-220); P. Aff., ¶12 (P. App. 303-304); P. App. Ex. 5 (P. App. 263-265). Subsequently, Trane provided medical leave and long-term disability benefits to Hartup. Hartup Depo. 181:20-182:6; 184:19-185:7, 189:8-21, 218:13-16 (P. App. 91, 92-93, 95; D. App. 85).[12]

During the next eight months, Hartup had three other surgeries and spent time recuperating. He visited with Trane company representatives throughout this period assuring them of his interest in returning to work and was repeatedly told he would be trained for new requirements of the indoor sales job. *Id.; see also,* P. Aff., ¶ 13 (P. App. 304); *see also,* Hartup Depo. 173: 17-25, 178:5-7 (P. App. 87, 89); P. Aff.,

---

Depo. 173:23-25 (P. App. 303, D. App. 72).
[11] No FMLA-based claims are presented here.
[12] Hartup applied for Social Security disability benefits in March, 2007, but was denied as "not disabled under [Social Security Administration] rules." Hartup Depo 222:17-20, 223:8 – 224:4).

¶ 10 (P. App. 303).

### 5. Hartup tries to return to Trane

Trane was at that time implementing a new business operations model known as the Parts Business System ("PBS system)." P. Aff., ¶ 11 (P. App. 303); Hartup Depo. 193:8-11 (D. App. 80). Trane told Hartup that once he had recovered from his surgeries he would be trained on PBS. Hartup Depo. 173: 17-25, 178:5-7 (P. App. 87, 89); P. Aff., ¶ 10 (P. App. 303). Implementation of the PBS system was completed in March 2007. Thoele Depo. 63:22- 64: 12 (P. App. 253). The PBS sales system did not eliminate any inside sales positions. Thoele Depo. 66:2-12 (P. App. 254). It did change their operations insofar as the "designated window" where Hartup had worked was eliminated. Smith Depo. 55:15-21, 80:21 – 81:16, 87:6-19, 88:19-21, 105:24 – 106:14; Mizell Depo. 47:2 – 48:1; Stewart Aff. ¶ 8 (D. App. 133, 138-141, 176-177, 220).

In April, 2007, Hartup was released to return to work effective May 1,2007. P. Aff., ¶ 14 (P. App. 304). During April, he spent over two weeks obtaining multiple versions of medical reports regarding his work restrictions at Trane's request. P. Aff., ¶ 14 (P. App. 304). He provided these to Dave Smith with Trane's human resources department. P. Aff., ¶ 15 (P. App. 305; P. App. Ex. 6; *see also* P. App. 266-70).

Dave Smith testified in deposition that Trane wanted to determine if his restrictions were workers-compensation related or not. Smith Depo. 54:3-11 (P. App. 219). While aware of Hartup's impression that he was providing documentation toward a return to work, Smith Depo. 54:3-11 (P. App.219), Smith knew that there was no job available for Hartup in the condition in which he returned from his sur-

gical regimen. Smith Depo. 55: I9- 56:1; 68:7-16 (P. App. 219, 222); *but compare,* Smith Depo. 86: 15-25 (P. App. 227).[13]

Hartup's permanent restrictions, established by his physicians, were: (1) no lifting over twenty-five (25) pounds; (2) no overhead activities; and (3) no more than eight (8) hours of work per day. Smith Depo. 7:10-8:12; 37:8-25 (P. App. 207, 214) P. Aff., ¶ 14 & P. App. Ex. 6 (P. App. 266-270, 304). These were essentially the same restrictions Trane had earlier accommodated. *See* P. Aff., ¶ 14 & P. App. Ex. 6, 17 (P. App. 266-70, 289, 304).

Smith met with Hartup on May 1, 2007, the day he was cleared to return to work. P. Aff., ¶ 15 (P. App. 305). Smith said he had nothing available for Hartup given his restrictions. *Id.* Hartup asked for his old job back, noting that the restrictions were the same, and also asked for the PBS training he had been promised. *Id.* Smith persisted in his position that Trane could not accommodate him in that job, so Hartup asked if there were any positions open where accommodation was possible. *Id.* Smith said he would speak with superiors and get back with Hartup on that issue. *Id.*

Hartup went home and checked for Trane positions online. P. Aff., ¶ 16 (P. App. 305, P. App. Ex. 7, P. App. 271-276); Smith Depo. 54:18-20 (P. App. 219). Later that day, and then on May 2, 2007, he applied for two jobs listed online, those being service account manager and an inside sales representative. *Id.* The online description of the essential functions and responsibilities of the position were the same as it

---

[13] The Court must resolve all reasonable doubts and s in the light most favorable to the non-movant and cannot make a credibility determination in light of conflicting evidence or competing s. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Trial v. Atchison, T. & S.F.R. Co.,* 896 F.2d 120, 122 (5th Cir. 1990); *Estiverne v. Lousiana State Bar,* 863 F.2d 371, 373 (5th Cir. 1989); *Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir. 1988).

had been when he left in July 2006 that job to being his round of surgeries. Smith Depo. 104:20-105:3 (P. App. 231).

Hartup insisted that he simply wanted to return to his old job. *Id.* He maintained then (as now) that whether technically disabled or not, he could be accommodated in it just as before. *Id.* It does not take an overly sentimental reader to wonder, as a practical matter rather than a legal one, why Trane treated him in so shabby a manner.[14]

In deposition, Smith testified that Hartup could have been accommodated for the inside sales position so long as Defendant had the manpower available.[15] Smith Depo. 103:22-25 (P. App. 231). Co-worker Bessie Mizzell confirmed this in her deposition testimony. Mizell Depo. 41:9-25 (P. App. 183). Hartup followed up with Trane officials, P. Aff., ¶ 17 (P. App. 305), including Smith and Gene Stewart. P. Aff., ¶ 18 (P. App. 306). Stewart told Hartup that Trane had no job available that could accommodate his restrictions and wanted to keep him on long-term disability. *Id.* Smith advised him that he could stay on disability benefits for "at least two years." *Id.*

Hartup then met with Kay Wolfe, a supervisor in the human resources department. P. Aff., ¶ 19 (P. App.306). She told him that he had been terminated from his old job, he was not on leave, and that he should be glad to "stay on long-term disability." *Id.* This was the first time that Hartup was told he no longer worked for Trane. *Id.*

---

[14] It is critical to note that Hartup's only claims are brought under the ADA, not the FMLA or other possible causes of action, and no opinion is expressed concerning those issues.
[15] Mr. Smith was responsible for the online application process, including monitoring and replying to same. Smith Depo. 99:2-11; P. App. 230.

Hartup began talking with MetLife, Trane's long-term disability carrier, to ve-rify Trane's representations. P. Aff., ¶ 20 (P. App. 306). After providing them with requested documents, *id.,* he was told by MetLife that "[T]he medical documentation does not substantiate your inability to perform your job beyond May 31, 2007." P. Aff., ¶ 24 (P. App. 307; P. App. Ex. 13; P. App. 283-284). MetLife terminated his bene-fits as of that date. *Id.*

 In early June, 2007, Hartup applied online for a service coordinator job with Trane, the stated requirements of which would have accommodated his permanent work restrictions. P. Aff., ¶ 26 (P. App. 308; Ex. 7; P. App. 275-276). Hartup never received a response to that application (or the previous two). *Id.* Trane has pro-duced undisputed evidence that neither the service coordinator position nor the outside parts sales representative position was ever filled. Smith Depo. 73:13 – 74:17, 100:23-25, 101:8 – 102:5, 105:7-18 (D. App. 134-135, 142-144).[16] The latter position was one from which Hartup had earlier received a transfer because of the aggravation of his physical problems due to prolonged spells of driving. *Id.* This left his application to return to his former position as an inside parts sales representa-tive. Smith Depo. 102:23 – 103:11 (D. App. 144-145).

In response to a request from Hartup, Smith verified by email that there were "no positions available to fully meet the (permanent restrictions) as prescribed by Mr. Hartup's physicians." *Id.*; Smith Depo. 77: 14-22 (P. App. 224; P. App. Ex. 9; P. App. 278-279). However, Smith conceded in deposition testimony that there were job titles that could meet the medical restrictions. Smith Depo. 77: 14-22 (P. App.

---

[16] There is no suggestion or evidence that improper motives caused the positions to remain unfilled, rather than business difficulties.

224).

Meanwhile, Hartup was still trying to learn whether Trane considered him an employee or not. P. Aff., ¶ 21 (P. App. 307); *see also,* Smith Depo. 77: 14-22 (P. App. 224; P. App. Ex. 9; P. App. 278-279; P. Aff., ¶ 22; P. App. 307; P. App. Exhs. 10, 11; P. App. 280-281). He sought information from the head of Trane's human resources department without success. P. Aff., ¶ 22 (P. App. 307; P. Aff., ¶ 23; P. App. 307; P. App. Ex. 12; P. App. 282). He contacted his benefits coordinator requesting "clarification on my current status with Trane," but heard nothing back. *Id.; see also* P. App Ex. 14; P. App. 285. Finally, he applied for unemployment benefits and began receiving them. P. Aff., ¶ 25 (P. App. 307-308); P. App. Ex. 18 (P. App. 290).

Hartup filed a charge of disabilities discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 25, 2007, alleging wrongful termination. Hartup Depo. 323:8-24; *see also* EEOC Charge of Discrimination filed by Hartup (D. App. at 119, 234-235). The EEOC dismissed his case on November 8, 2007, stating that it was "unable to conclude that the information obtained establishes violations of the statutes." Hartup Depo. 334:19 – 335:4, 335:24 – 336:5; *see also* EEOC Dismissal and Notice of Rights directed to Hartup (D. App. at 120-122, 236).

A final twist in the situation came by mail on or about November 27,2007. P. Aff., ¶ 28 (P. App. 308). Trane sent a letter to Hartup threatening termination of employment on December 5,2007, if he did not provide evidence of employability with his work restrictions. *Id.* The letter also stated (incorrectly)[17] that Hartup was still

---

[17] Smith agreed in deposition testimony that this was inaccurate. The letter was actually written by an attorney for Trane months earlier. Smith Depo. 90:7-17, 93: 12-19; P. App. 228. The letter offered Hartup an opportunity to communicate with Trane about necessary

receiving disability payments, but that this would stop on December 5,2007. P. App. Ex. 18 (P. App. 290). This baffled Hartup, who had been told he was already terminated, and who had received unemployment benefits. P. Aff., ¶ 25 (P. App. 307-308; P. App. Ex. 18; P. App. 290).[18]

### 6. Hartup files suit

Hartup originally sought relief against Trane on the basis of the ADA, the Employment Retirement Income Security Act, and the Texas Labor Code. Doc. # 1. However, the parties submitted a Joint Stipulation and Agreed Motion to Dismiss Certain Claims with Prejudice (Doc. # 22) on April 21, 2009, requesting dismissal with prejudice of Hartup's "claims under Chapter 451 of the Texas Labor Code and Section 510 of the Employee Retirement Income Security Act." Doc. # 22 at 1. The Court dismissed those claims on July 13, 2009. Doc. # 38. The remaining claims are based in the ADA.

### II.    LEGAL STANDARD

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

---

accommodations to the essential functions of his job and returning to work with or without reasonable accommodations. P. App. Ex. 18; P. App. 290. The letter was designed to provide a time for Hartup to call Smith and advise him if "he could still do some things" but was not sent when written. Smith Depo. 90:7-17, 93: 12-19. P. App. 228. 28.

[18]   The factual resume is presented in the light most favorable to the plaintiff, not as findings of fact. However, the Court deems it prudent to note that it does not condone such things as a matter of social policy, which is not the Court's province, but merely applies the law, which can have hard results. Nothing in the law provides relief solely on the basis of injury at the hands of disinterested management, its acceptance of incompetent actions, or its lack of simple decency in dealing with long-time employees.

248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Mason v. United Air Lines,* 274 F.3d

314, 316 (5th Cir. 2001. A genuine issue of material fact exists "if the evidence is

such that a reasonable jury could return a verdict for the non-moving party." *Id.* The

movant makes a showing that there is no genuine issue of material fact by informing

the court of the basis of its motion and by identifying the portions of the record,

which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett,* 477

U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); FED. R. CIV. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the

court's attention to evidence in the record sufficient to establish that there is a ge-

nuine issue of material fact for trial. *Celotex,* 477 U.S. at 323-24. To carry this bur-

den, the "opponent must do more than simply show . . . some metaphysical doubt as

to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Instead, the non-movant must show

that the evidence is sufficient to support a resolution of the factual issue in his favor.

*Anderson,* 477 U.S. at 249.

Neither conclusory allegations nor unsubstantiated assertions will satisfy the

non-movant's summary judgment burden. *Little v. Liquid Air Corp.,* 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.

1992). The party opposing summary judgment is required to identify specific evi-

dence in the record and to articulate the precise manner in which that evidence

supports his claim. *Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998).

Summary judgment in favor of the defendant is proper if, after adequate time for

discovery, the plaintiff fails to establish the existence of an element essential to his

case and to which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

When weighing the evidence on a motion for summary judgment, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. See *Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir. 1988). The Court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

**III.   Analysis**

**A.   American with Disabilities Act Claims**

Hartup's remaining claim is based on the employment provisions of the Americans with Disabilities Act ("the ADA"), 42 U.S.C. §§ 12101 – 12109. It is unlawful under the ADA to refuse to hire or fail to accommodate a qualified individual with a disability because of that disability. 42 U.S.C. § 12112(a). Hartup seeks "all damages to which he is entitled under" the ADA, attorney fees, prejudgment interests and court costs. P. Compl. 8, ¶ 23.

Hartup contends that a "trial must happen here to allow Plaintiff to pursue a remedy for the callous plan to ignobly end his ennobling employment at Defendant." P. Brief 50. The factual resume above shows that evidence can be presented demonstrating that the termination of his employment should have been handled differently. The question for this Court is whether it was illegal under the theory he has al-

leged in the case. If it was, his remedy lies here. If not, then the Court lacks the power under his pleadings to provide a remedy.

### 1. Hiring discrimination

Hartup contends that Defendant refused to hire him for a new position when required to do so under the ADA. Accordingly, Hartup must show that: (1) he has a *disability*; (2) he was a *qualified individual* in respect of the job for which he applied; and, (3) Defendant refused to hire him, or failed to accommodate him, *because* of that disability. *Burch v. City of Nacogdoches,* 174 F.3d 615, 619 (5th Cir. 1999); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1024 (5th Cir.1999); *Rogers v. International Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir. 1996).

The ADA has a specialized vocabulary. A *disability* is: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2); *Sutton v. United Airlines, Inc.,* 527 U.S. 471 (1999), *superseded in part by statute,* ADA Amendments Act of 2008, PUB.L. 110-325, 122 STAT. 3553 (2008); *Rodriguez v. ConAgra Grocery Prod. Co.,* 436 F.3d 468, 474 (5th Cir. 2006).

A *major life activity* is an activity that is "central to the life process itself."[19] *Bragdon v. Abbot,* 524 U.S. 638, 624 (1998); *Waldrip v. GE,* 325 F.3d 652, 655 (5th Cir. La. 2003); *Dupre v. Charter Behavioral Health Systems of Lafayette, Inc.,* 243 F.3d

---

[19] "Major life activity" is not defined in the 1990 ADA. It has since been defined by amendment in the 2008 ADAAA. However, that definition is not retroactive, as explained below. Before the 2008 amendments, the phrase was defined through regulations and case law. *See also EEOC v. Chevron Phillips Chem. Co., LP,* 2009 U.S. App. LEXIS 12148, *20, n.4 (5th Cir. June 5, 2009) ("While the Supreme Court has not decided what deference, if any, is due to implementing regulations issued by the EEOC, it has relied on these regulations in analyzing [ADA] cases, particularly when neither party to a case challenges their reasonableness.")

610, 613-14 (5th Cir. 2001). Major life activities are those basic activities that the average person in the general population can perform with little or no difficulty, and they include, but are not limited to, walking, *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1025 (5th Cir. 1999), seeing, *Still v. Freeport-McMoran, Inc.,* 120 F.3d 50, 52 (5th Cir. 1997) eating, *Waldrip,* 325 F.3d at 655, hearing, *Ivy v. Jones,* 192 F.3d 514, 516 (5th Cir. 1999), and reproduction, *Bragdon*, 524 U.S. at 637-39. 29 CFR 1630.2(i);[20] *see generally Jenkins v. Cleco Power LLC,* 487 F.3d 309 (5th Cir. La. 2007); *Curl v. United Supermarkets,* 179 Fed. Appx. 208, 208 (5th Cir. 2006); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 725, n.7 (5th Cir. 1995). A major life activity does not necessarily have to be conducted in public, economically oriented, or underta-ken daily. *Id.*

A person is *substantially limited* in a major life activity if (s)he is unable to perform the activity; or significantly restricted in the condition, manner, or duration under which he can perform the activity as compared to the average person in the general population. 29 CFR 1630.2(i); *Moreno v. Brownlee*, 85 Fed. Appx. 23, 27 (5th Cir. Jan. 7, 2004); *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995).

The factors considered in determining whether an individual is substantially limited in a major life activity generally include: the nature and severity of the im-pairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of, or resulting

---

[20] The CFR provisions cited are those in force at the time relevant to this lawsuit.

from, the impairment.[21] *Id.* The burden is on Hartup to produce evidence substantiating that he faces limitations preventing or severely restricting him "from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 198 (2002), *superseded in part by statute,* ADA Amendments Act of 2008, PUB.L. 110-325, 122 STAT. 3553 (2008); *Hinojosa v. Jostens Inc.,* 128 Fed. Appx. 364, 367 (5th Cir. Tex. 2005).

Factors to consider in determining if an individual is substantially limited in a major life activity as it pertains to work include: the relevant geographical area; the job from which the individual has been disqualified because of an impairment, and the number and types of similar jobs within that area from which the individual is also disqualified because of the impairment (the "class of jobs"); and the job from which the individual has been disqualified because of an impairment, and those other jobs in the area that do not use similar training, knowledge, skills or abilities (the "broad range of jobs in various classes"). 29 CFR 1630.2(j).

A person has *a record of such an impairment* if he has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities. 29 CFR 1630.2(k). A person is *regarded as having such an impairment* if he: has a physical or mental impairment that does not substantially limit major life activities, but is treated by Defendant as having a substantially limiting impairment; or has a physical or mental impairment that substantially

---

[21] While it is easy to conflate them, it is important to remember that in ADA litigation the terms *restrictions, substantial limitations, impairments* and *disability* each have their own meaning. Generally speaking, a *restriction* is the prescribed limitation on a subject's activity that results from the medical assessment of his *impairment.* It becomes a disability only if it *substantially limits* him in performing a major life activity.

limits one or more major life activities, but only because of the attitudes of others toward the impairment; or has no actual impairment at all, but is treated by an employer as having a substantially limiting impairment. 29 CFR 1630.2(l).

A *qualified individual* is one who, with or without reasonable accommodations, can perform the essential functions of the job. 29 CFR 1630.2(m).

*Essential functions* are those that are fundamental to the job at issue. 29 CFR 1630.2(n). The term does not include the marginal functions of a job. 29 CFR 1630.2(n)(1). A variety of factors may be considered in deciding whether a function is essential: the reasons the job exists, the number of employees available within the company for that work, the degree of specialization the job requires, the employer's judgment as to which functions are essential, written job descriptions prepared before advertising or interviewing applicants for the position, the consequences of not requiring an employee to satisfy that function, and the work experience of others who held the position. 29 CFR 1630.2(n)(2).

**2. Reasonable accommodation**

Hartup also argues that Defendant terminated him after failing to provide him with reasonable accommodation as required under the ADA so that he could take up his former position after medical leave.[22] In that regard, Hartup must prove that: (1) He had a disability; (2) he was qualified for the job; (3) Defendant knew of his disability; (4) Hartup requested an accommodation; (5) a reasonable accommo-

---

[22] The Court must review contradictory positions on exactly what the adverse employment decision by Trane was since, as the record demonstrates, Trane itself did not seem to have any clearly established view on the matter. *See, e.g.,* P. Aff., ¶ 28; P. App. 308. P. App. Ex. 18; P. App. 290. P. Aff., ¶ 25; P. App. 307-308; P. App. Ex. 18; P. App. 290.

dation existed that would have allowed him to perform the essential functions of the job; and (6) Defendant failed to provide a reasonable accommodation.

A *reasonable accommodation* is one that is *ordinarily* reasonable, or reasonable in most cases, and modifies the work environment so that the disabled individual is able to work productively within it. *See* 29 CFR 1630.2(o). Reasonable accommodations may include, for example: making existing facilities used by employees readily accessible to and usable by individuals with disabilities; or job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. *Id.*

An *undue hardship* is an action requiring significant difficulty or expense considered in light of relevant factors. 29 CFR 1630.2(p). Those factors include: the nature and cost of the accommodation; the financial resources of the facility involved in the accommodation; the number of persons employed there; the effect on expenses and resources, or the impact otherwise on the facility's operation; the Defendant's financial resources; the size of the Defendant's business with respect to the number of employees; the number, type, and location of Defendant's facilities; the nature of Defendant's business, including the composition, structure, and functions of the Defendant's workforce; and the nature of any affected facility. An employer need not provide a reasonable accommodation if it can prove that the accommodation would impose an undue hardship on its business operations. 42 U.S.C.

§ 12112(b)(5).

### B.   <u>Application in Hartup's Case</u>

The Court first turns to whether the standards set out in the 2008 ADA

Amendment Act apply retroactively to this case. Hartup urges the Court to take note

of recent amendments to the ADA and to give them retroactive effect.[23] Certainly,

the Court is aware there have been debates over certain court decisions regarding

the original ADA and criticisms of the law among commentators. In response,

Congress passed the ADA Amendments Act of 2008 ("2008 ADAAA"), Pub. L. No.

110-325, 122 Stat. 3553 (2008). In the 2008 ADAAA, Congress specifically

superseded certain aspects of *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999),

*superseded in part by statute,* ADA Amendments Act of 2008, Publ. L. 11-325 (2008),

and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002),

*superseded in part by statute,* ADA Amendments Act of 2008, Publ. L. 11-325

(2008).[24] *Id.* Congress' express purposes included the intent

1)   *to carry out the ADA's objectives of providing "a clear and comprehensive
national mandate for the elimination of discrimination" and "clear, strong,*

---

[23] The Plaintiff contends that "[e]ven if the [ADAAA is] not retroactive, the unfairness of a restrictive interpretation of the ADA contrary to the intent of Congress as of 1990 when it passed the ADA cannot be so blithely dismissed." P. Brief at 9 (citing the ADAAA's intent "[t]o restore the intent and protections of the Americans with Disabilities Act of 1990." *Id.* By this, Hartup refers to the 2008 statement by Congress as to what the Congress of 1990 had in mind in establishing the final version of the ADA. As a district court, this Court has the choice of applying either the 2008 Act or the 1990 Act, as each has been construed in higher court precedent. That decision itself is governed by law, which, as explained below, requires the application 1990 Act.

[24] Congress expressed displeasure that, "in particular, the Supreme Court, in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002),* interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress, *id.* at 7; and found that "the current Equal Employment Opportunity Commission ADA regulations defining the term 'substantially limits' as 'significantly restricted' are inconsistent with congressional intent, by expressing too high a standard." *Id.* at 8.

*consistent, enforceable standards addressing discrimination" by reinstating a broad scope of protection to be available under the ADA;*

2)  *to reject the requirement enunciated by the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures;*

3)  *to reject the Supreme Court's reasoning in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in School Board of Nassau County v. Arline, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;*

4)  *to reject the standards enunciated by the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives";*

5)  *to convey congressional intent that the standard created by the Supreme Court in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis; and*

6)  *to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term "substantially limits" as "significantly restricted" to be consistent with this Act, including the amendments made by this Act.*

*Id.* Congress therefore promulgated much more detailed definitions of "disability" and associated terms, together with related modifications to the ADA dealing with rules of construction among other things. *See id.*

Courts presume a statute does not apply retroactively unless Congress ex-

pressly states otherwise in the statute. *AT&T Corp. v. Hulteen*, 129 S. Ct. 1962, 1971 (U.S. 2009) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 272-273 (1994). In *Hulteen,* the Supreme Court so held while dealing with a situation closely analogous to the instant case in that Congress passed the Lily Ledbetter Fair Pay Act of 2009 to override that Court's interpretation of the Pregnancy Discrimination Act. *Id.* The *Hulteen* Court reaffirmed that "a presumption against retroactivity will generally coincide with legislative and public expectations." *Id.*

The Fifth Circuit has since held that the presumption against retroactivity applies to ADA cases based on events pre-dating the 2008 amendments. *EEOC v. Agro Distrib.,* 555 F.3d 462, 469 n. 8 (5th Cir. 2009); *see also Kemp v. Ashcroft,* 2009 U.S. Dist. LEXIS 16426, *7 n. 3 (W.D. La. March 3, 2009); *Schmitz v. Louisiana,* 2009 U.S. Dist. LEXIS 5495, *3-4 (M.D. La. January 27, 2009). Courts are disciplined by this presumption from imposing new and unexpected burdens on those whose decisions and actions conformed to the law at the time. *Landgraf*, 511 U.S. at 270 (1994).[25] "Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that is an acceptable price to pay for the countervailing benefits." *Id.* at 272-73.

This bright line rule is necessary to avoid almost constant uncertainty in the law. That is particularly true in this area of the law as "Congress frequently disagrees with Supreme Court interpretations of Title VII and other employment discrimination laws" resulting in over-ride legislation. Deborah A. Widiss, *Shadow Pre-*

---

[25] *See also* Jill E. Fisch, *Retroactivity and Legal Chance: An Equilibrium Approach,* 110 Harv. L. Rev. 1055, 1066 (1997) (The Supreme Court is consistently concerned about issues of notice and fairness of retroactivity whether of legislative or adjudicative origins).

*cedents And The Separation Of Powers: Statutory Interpretation Of Congressional Overrides*, 84 Notre Dame L. Rev. 511, 515 (2009) (Citing the 2008 ADAAA as one more example). Absent the presumption, no one could make rational choices in employment law as the threat of retroactive application by some courts, and not by others, would be a chaotic constant.

There is a constant effort by aggrieved interest groups to persuade Congress to override Supreme Court decisions. *See* William N. Eskridge, Jr., *Overriding Supreme Court Statutory Interpretation Decisions,* 101 Yale L.J. 331, 359-360 (1991). And Congress itself laudably pays great attention to the plight of the disabled, refining legislation intended to benefit them. Certainly that is proper in the legislative realm, but it emphasizes the need for lower courts to avoid guessing at congressional intent when it is not voted into and expressed within the statute. *Landgraf* resolved what had been an unwieldy inconsistency in how lower courts treated retroactivity.[26]

Accordingly, the law to be applied in this case is that of the ADA preceding the 2008 amendments.

**C.      Hartup's Disability Discrimination Case**

**1. The job to be considered**

The state of the evidence renders analysis of Hartup's case simpler than it might ordinarily be in that only one position requires attention. Undisputed evi-

---

[26] *See also* Jan G. Laitos, *Legislative Retroactivity*, 52 Wash. U. J. Urb. & Contemp. L. 81, 122 (1997); *see also* Widiss, *Shadow Precedents*, 84 Notre Dame L. Rev. 511,514 (2009)("Lower courts, in particular, are faced with competing signals: they must apply the law as Congress enacts it, but they must also follow Supreme Court (and circuit court) precedent to the extent that it is not clearly superseded.")

dence shows that the other two positions for which he applied were never filled by anyone, thereby removing them from possible instances of disability discrimination. Hartup has not developed a record as to any other possible jobs about from references to the size of Trane's business, which is not quantified, nor specific as to what other jobs Trane may or may not have had available.

Consequently, the one job that requires attention is the position the inside sales position he held prior to his medical leave. This is the position to which he wanted to return. Trane maintains the job was essentially eliminated as the window post he had manned was cut from Trane's operational procedures. Reading the evidence in the light most favorable to the non-movant, the Court will consider the position to have been modified, as it does not appear a personnel redundancy had arisen. Rather, the evidence suggests Trane had the same number of persons doing inside sales, but had eliminated a specialty task into which he had fit before with accommodations from co-workers.

### 2. Hartup's Claims

Hartup argues that Defendant failed to provide him with reasonable accommodation as required under the ADA so that he could take up his former position after medical leave. In that regard, Hartup must prove that: (1) He had a *disability*; (2) he was a *qualified individual*; (3) Defendant knew of his disability; (4) Hartup requested an *accommodation*; (5) a *reasonable accommodation* existed that would have allowed him to perform the *essential functions* of the job; and (6) Defendant failed to provide a reasonable accommodation.

Hartup also contends that Defendant refused to hire him for a new position

when required to do so under the ADA. Accordingly, Hartup must prove by a pre-ponderance of the evidence that: (1) he has a *disability*; (2) he was a *qualified indi-vidual* in respect of the job for which he applied; and, (3) Defendant refused to hire him, or failed to accommodate him, *because* of that disability.

### a.      May imputed disability be considered?

Before considering Hartup's disability status, the Court must first take notice of exactly what he alleged. His complaint does not allege either that he had a history of disability or was "regarded as" having a disability. It relies solely on the claim that he was disabled at the time of the decision from which his grievance arises. The first assertion of these bases for a claim has been in defense against summary judgment, without support in the pleadings. Accordingly, the Court may not entertain those arguments now. *See Carter v. Ridge*, 255 Fed. Appx. 826, 831 (5th Cir. Tex. 2007); *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 & n.3 (5th Cir. 1990).

### b.      Did Hartup have a disability?

*Disability* under the standards of the ADA is the threshold that must be crossed before any other issues are relevant. *Rogers v. Internat'l Maritime Terminals, Inc.,* 87 F3d 755, 758 (5th Cir. 1996). By definition, the Act exists for the protection of the disabled, not those whose impairments do not rise to the level of disability. Individuals' physical and mental abilities vary. Hartup's impairments are not con-tested. They are: (1) no lifting over twenty-five (25) pounds; (2) no overhead activi-ties; and (3) no more than eight (8) hours of work per day. Smith Depo. 7:10-8:12; 37:8-25 (P. App. 207, 214) P. Aff., ¶ 14 & P. App. Ex. 6 (P. App. 266-270, 304).

A physical impairment "is not necessarily a disability as contemplated by the

ADA."[27] *Dutcher,* 53 F3d at 726. "The statute requires an impairment that substantially limits one or more of the major life activities." *Id.*; *see also Moreno v. Brownlee,* 85 Fed. Appx. 23, 27 (5th Cir. 2004). The Court must decide if the impairment substantially limits a major life activity "in light of (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact." *Dutcher,* 53 F.3d at 726 (Citing 29 CFR § 1630, App., § 1630.2(j)). Hartup must therefore produce evidence that his impairments substantially limit a major life activity and that he could perform the essential duties of the position from which he was terminated, either with or without accommodation.

The Court must proceed with a two-pronged inquiry. First, the Court should *not* make a determination of whether Hartup is "substantially limited in working" if he is "substantially limited in any other major life activity." 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630, App., § 1630(2)(j); *Dutcher,* 53 F.3d at 726. If he is not substantially limited with respect to another major life activity, then "his ability to perform the major life activity of working should be considered." *Id.; see also EEOC v. Exxon Corp.,* 124 F.Supp. 987, 995 (N.D.Tex. 2000).

Hartup's *impairments* are not contested. They are: (1) no lifting over twenty-five (25) pounds; (2) no overhead activities; and (3) no more than eight (8) hours of work per day. Smith Depo. 7:10-8:12; 37:8-25 (P. App. 207, 214) P. Aff., ¶ 14 & P. App. Ex. 6 (P. App. 266-270, 304).  He claims these as his "substantial limitations in a major life activity." *See* Plaintiff's Brief in Support at 10-17 (Doc. # 30 at 19-26).

---

[27]   The Plaintiff's Brief conflates the two, a common error.

Hartup's circumstances in this regard are strikingly similar to those in *Dutcher. See Dutcher,* 53 F.3d at 726. He is able to care for himself through the course of normal activities in daily living. *See, id.* He is able to lift objects up to a certain weight, provided he doesn't have to reach overhead. *Compare, id.* (Plaintiff could "do lifting and reaching as long as she avoids heavy lifting and repetitive rotational movements."); *see also, Pryor v. Trane Co.,* 138 F.3d 1024, 1027 (5th Cir. Tex. 1998). As in *Dutcher,* there is no summary judgment evidence from which a jury might infer Hartup was substantially limited in a major life activity. *See, id.*

The Court therefore turns to whether Hartup's impairments substantially limit him with respect to working. For this standard, Hartup must show that his impairments significantly restricted his ability to perform "either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i); *see Sutton v. United Airlines,* 527 U.S. 471, 491 (1999), *superseded in part by statute,* ADA Amendments Act of 2008, Publ. L. 11-325 (2008). The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *Id.; see also, Hileman v. City of Dallas,* 115 F.3d 352, 354 (5th Cir. 1997). The inability to perform heavy lifting does not render a person substantially limited in the major activities of lifting or working. *Dutcher,* 53 F.3d at 726-27; *see also Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir. Tex. 1996); 29 C.F.R. § 1630(j)(3)(i).

Hartup does not dispute the evidence that some lifting and other job requirements beyond his limitations were essential aspects of the job, only arguing that he could be accommodated regarding them. But accommodation is required af-

ter the determination of disability; i.e., the determination that his impairments sig-
nificantly restricted this salesman's ability to work in "a class of jobs" or "broad
range of jobs" in the Dallas-Fort Worth, Texas, area. *Id.; see also Pryor v. Trane Co.,*
138 F.3d 1024, 1027 (5th Cir. 1998); *Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800,
805 (5th Cir. 1997).

Three factors are deemed useful in making that determination: (1) the rele-
vant geographical area in which Hartup works; (2) the number and types of jobs in
that locality utilizing similar training, knowledge, skills or abilities, from which the
individual is also disqualified because of the impairment (class of jobs); and (3) the
number and types of other jobs in that locality not utilizing similar training, know-
ledge, skills or abilities, from which the individual is also disqualified because of the
impairment (broad range of jobs in various classes). 29 C.F.R. § 1630.2(j)(3)(ii)(A)-
(C). *Dutcher,* 53 F.3d at 727, fn. 13.

Hartup has directed the Court to no such evidence in opposing summary
judgment beyond a vague allusion to Trane as a company of some size (not de-
scribed by number or relation to others). In itself, this is crippling to his case. *See
Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1120 (5th Cir. 1998); *EEOC v. Exxon
Corp.,* 124 F.Supp.2d 987, 1000 (N.D. Tex. 2000); *Perry v. Dallas Indep. Schl. Dist.,*
1998 WL 614668 (N.D. -- Tex Sept. 2, 1998).

The Court is left to focus on the changes to his job. *Burch v. City of Nacog-
doches,* 174 F.3d 615, 620-21 (5th Cir. 199). The change in his position required him
to lift items over twenty-five pounds in weight and to reach over his head, as well as
possibly work more than eight hours in one day. The Fifth Circuit has held that

heavy lifting restrictions are insufficient evidence of a substantial limitation on the major life activity of working. *Ryburn v. Potter,* 155 Fed. Appx. 102, 110-111 (5th Cir. 2005); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1120 (5th Cir. 1998); *Clouse v. Boise Cascade, Inc.,* 131 F.3d 140 (5th Cir. 1997). Nor do restrictions on reaching above one's head, even taken together with other restrictions. *See Dutcher,* 53 F.3d 723.

Restrictions on hours in a day or week of work do not amount to a substantial limitation on the major life activity of working. *Piper v. Kimberly-Clark Corp.,* 970 F.Supp. 566, 572-573 (E.D. Tex. 1997); *see also Boerst v. General Mills Operations, Inc.,* 25 Fed. Appx. 403 (6th Cir. 2002); *Kellogg v. Union Pacific Railroad Co.,* 233 F.3d 1083, 1087 (8th Cir. 2000). Nor do these several restrictions taken together. See *Piper,* 970 F.Supp. at 571.

The majority of the duties of the indoor sales position had not changed. The inability to do one aspect of a job does not constitute a substantial limitation if the subject is able to perform the work in general. *Dutcher,* 53 F.3d at 727 (*citing Chandler v. City of Dallas,* 2 F.3d 1385 (5th Cir. Tex. 1993), *cert. den.* 511 U.S. 1011 (1994). In *Dutcher,* for example, an employee's inability to perform her welding job due to her injured arm because it required climbing was insufficient to establish a substantial limitation because she could work as a welder in general. *Dutcher,* 53 F.3d at 727.

Mizzel's deposition testimony supports the inference that in the new inside sales system, Hartup's physical restrictions would have come into play roughly five to ten times in a five day work week. Mizell Depo. 35:21-36:2; 110:7-10, 18-25 (P.

App. 182,201). Hartup would have needed help once or twice a day. Mizell Depo.

110: 18-111:6 (P. App. 201). Further testimony established that Trane used mobile

(wheeled) stepladders to pull stock from shelves so that inside sales representatives

rarely had to reach overhead. Mizell Depo. 116:21-120:19 (P. App. 202-203). His co-

worker Mizell testified she would have had no objection helping him in those in-

stances[28] or helping him once or twice a day to life items weighing over twenty-five

pounds. Mizell Depo. 116:21-120:19 (P. App. 202-203).

Trane has presented the "Inside-Sales Parts Job Description" ("Written Job

Description") as to which Hartup does not protest nor direct the Court to evidence

questioning its authenticity. Trane points to deposition testimony from Mizell and

Smith, as well as an affidavit from Stewart, that expands on the terms of written de-

scription, stating that:

> [w]ithin the Inside Sales-Parts Department, sales representatives are
> required on a daily basis to (i) load and unload shipments of parts,
> supplies, and equipment; (ii) receive and process customer orders;
> and (iii) deliver parts orders to customer locations or job sites. As a
> result, a sales representative must be physically capable of pulling,
> lifting, reaching, pushing, loading and unloading parts that weigh be-
> tween 25 and 100 pounds, numerous times a day, and also must be
> able to lift a requested part from the floor or pull it off of a shelf from
> overhead. Many of the parts are stacked high on shelves which may be
> as high as twelve (12) feet or on top of other parts in the warehouse.
> Sales representatives are further required to work overtime or "on-
> call" hours throughout the year. Only one representative is scheduled
> for any given "on-call" shift, and during that time, a sales representa-
> tive may be required to perform all of the regular duties of a sales rep-
> resentative." (Footnotes omitted).

See Mizell Depo. 25:16- 26:6, 28:15 – 29:22, 30:8-14, 35:21 – 36:2, 37:5-19, 39: 19-

---

[28] Trane had taller ladders available, although in some areas they could not fit in the aisles.
Mizell Depo. 116:21-120: 19 (P. App. 202-203).

23, 107:13-17; Smith Depo. 102:23-103:2, 107: 5-11, 114: 2-7; Stewart Aff. ¶ 3 (D.

App. 144-145, 148-149, 166-67, 171, 186, 218, 223-224).

An impairment that affects only a narrow range of jobs is insufficient to establish disability under the law applicable to this case.[29] *Id.* Trane would have been obligated to continue accommodating a disability, but not to continue a *gratis* accommodation of limitations that do not rise to the level of disability. The ADA does not impose a duty to transfer an employee who becomes unqualified for his job. *Florence v Frank,* 774 F.Supp. 1054, 1062 (N.D. Tex. 1991).

Accordingly, the Court finds that Hartup has not directed it to evidence in the record from which a jury could infer that he met the threshold requirement of being "disabled" under the ADA. The absence of disability precludes relief under the statute. Since Hartup has not produced evidence of disability, further analysis is precluded.

### c. Was Hartup a "qualified individual" under the ADA?

Even if disabled, Hartup would still have to produce evidence that, with or without accommodation, he could perform the essential functions of the employment position he sought. 42 U.S.C. § 12111(8). The statute further requires the Court to give consideration to "the employer's judgment as to what functions of a job are essential," including any written description prepared by the employer. *Id.*

In the window sales position he had previously held, Hartup benefitted from Trane's willingness to have other employees assigned in the area to do those tasks that surpassed his physical limitations. The elimination of the window position that

---

[29] The Court's opinions in the instant case do not reflect one way or the other on how such facts would be viewed under the 2008 ADAAA.

he held before his leave resulted in a consolidation of the indoor sales positions to one set of requirements.

The job then required a day spent taking orders at a counter, then locating and lifting the required equipment to that counter. Transfer of the equipment from the shelf to the customer at the counter was the essence of the job. Without accommodation, Hartup was unable to do those parts of this essential function involving certain weights or reaching certain items.

The only proposed "accommodation" suggested by Hartup is that other employees could do part of his work for him.[30] Trane suggests this would be an undue burden. The Court does not need to perform "undue burden" analysis, because reasonable accommodation does not in any event require a company to hire more personnel, require other current employees to do any part of the work of the disabled employee or otherwise reorder its workforce. *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996); *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995). [31] Accommodations required are modifications of the working environment, not the job itself. *Id.*

---

[30] This is indeed the hardest aspect of disability law: companies may render the "kindness of strangers" to supply a job to someone incapable of actually doing that job, in the same manner that millions of Americans every day contribute money to those in need. *See, e.g.,* Nicole B. Porter, *Reasonable Burdens: Resolving the Conflict Between Disabled Employees and Their Coworkers,* 34 Fla. St. U.L. Rev. 313 (2007). However, this is (for obvious reasons) not a requirement of law.

[31] *See also* Carrie L. Flores*, Disability Is Not A Trump Card: The Americans With Disabilities Act Does Not Entitle Disabled Employees To Automatic Reassignment,* 43 Val. U.L. Rev. 195, 198-259 (2008).

### D.      Hartup's "Duty to Confer" Claim

Hartup has placed particular emphasis on a duty imposed by regulation for a company to engage in a dialogue with a disabled employee seeking alternative job placement within the company before declaring accommodation an undue hardship. *See, EEOC v. Chevron Phillips Chem. Co.,* 2009 WL 1564164 (June 5, 2009); *Loulseged v. Akzo Novel, Inc,* 178 F.3d 731 (5th Cir. 1999).[32]

Again, disability is the threshold that must be crossed to obtain that right. *Newberry v. East Texas State Univ.,* 161 F3d, 276, 280 (5th Cir. 1998). Hartup relies heavily on the recent *Chevron* decision. *Chevron Phillips Chem. Co.,* 2009 WL 1564164. Among other points of distinction,[33] the plaintiff in that case was found to be disabled for purposes of the ADA. Even if Hartup had developed evidence of such a disability, the Court would nonetheless be bound to note that Trane did engage in dialogue upon his prospective return.

### E.      Hartup's Retaliation Case

Finally, Hartup further alleges that Trane retaliated against him for asserting his rights under the ADA. The ADA makes it unlawful to discriminate against any individual because (s)he took shelter under its provisions or facilitated its purposes in various listed ways. *See* 42 U.S.C. § 12203(a). Hartup therefore must show that: (1) he engaged in statutorily protected activity; (2) an adverse employment action occurred; and (3) a causal connection exists between the protected activity and the adverse employment action. *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 511

---

[32] *See also, See, e.g.,* Jessica Leigh Rosenthal, *The Interactive Process Disabled: Improving The ADA And Strengthening The EEOC Through The Adoption Of The Interactive Process*, 57 Emory Law J. 247 (2007).
[33] *See D. Reply Brief, 23.*

(5th Cir. 2003); *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001); *see also Raggs v.*

*Miss. Power & Light Co.,* 278 F.3d 463, 471 (5th Cir. 2002); *Smith v. Methodist Hosps.,*

2008 U.S. Dist. LEXIS 103588, *20 (N.D. Tex. Dec. 19, 2008); *Bennett v. Calabrian*

*Chems. Corp*., 324 F. Supp. 2d 815, 838-839 (E.D. Tex. 2004) *and cases cited therein.*

### 1. Burdens of Proof & Available Inferences

ADA retaliation claims are examined in a manner consistent with those

brought under Title VII. *Sherrod*, 132 F.3d 1112, 1122 5th Cir. 1998); *Bennett v. Ca-*

*labrian Chems. Corp.,* 324 F. Supp. 2d 815, 838 (E.D. Tex. 2004). Thus, a case built on

circumstantial evidence must be examined under *McDonnell-Douglas. See McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792 (1973). Either direct or circumstantial evidence

can establish retaliation under the ADA. *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394,

396 (5th Cir. 1995). *Direct evidence* is evidence that proves the fact in question

without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409,

415 (5th Cir. 2003). In the employment discrimination context, this includes "any

statement or document which shows on its face that an improper criterion served as

the basis for an adverse employment action." *Id. at 415*.

*Circumstantial evidence* is evidence that requires an inference be made from

it before that evidence is probative as to an employer's discriminatory animus in

taking adverse actions against the former employee. *Sandstad v. CB Richard Ellis,*

*Inc., 309 F.3d 893, 897-98 (5th Cir. 2002)*. The *McDonnell Douglass* burden-shifting

test applies to circumstantial cases brought under the ADA. *Raytheon Co. v. Hernan-*

*dez*, 540 U.S. 44, 49 (2003).[34] If the Plaintiff has no direct evidence of unlawful dis-

---

[34] Observers disagree as to the full reach of the *McDonnell Douglas* test. *See, e.g.,* Sandra F.

crimination the Court must evaluate whether summary judgment is appropriate using the *McDonnell Douglas* approach. *Id.*

The *McDonnell Douglas* burden-shifting approach has three phases. *See Rios v. Rossotti, 252 F.3d 375, 378 (5th Cir. 2001)*. Under the first prong, Hartup must establish *a prima facie* case of disability discrimination. *See Rachid, 376 F.3d at 309*. Once Hartup makes a *prima facie* case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the challenged employment decision. *Machinchick, 398 F.3d at 352*. The defendant need not persuade the court that it was actually motivated by the proffered reasons. *Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 255, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*.[35] At this stage, the burden on the employer is only one of production, not persuasion, involving no credibility assessments. *Russell v. McKinney Hospital Venture, 235 F.3d 219, 222 (5th Cir. 2000)*. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. *Burdine, 450 U.S. at 255*.

The rebuttal of the presumption created by the *prima facie* case requires only a minimal showing. *Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 813 (5th*

Sperino *Recreating Diversity In Employment Law By Debunking The Myth Of The McDonnell Douglas Monolith,* 44 Hous. L. Rev. 34 (2007); Michael Evan Gold, *Towards a Unified Theory of the Law of Employment Discrimination,* 22 Berkeley J. Emp. & Lab. L. 175 (2001); *compare,* Stephen F. Befort and Holly Lindquist Thomas, *The ADA in Turmoil: Judicial Dissonance, the Supreme Court's Response, and the Future of Disability Discrimination Law* 78 Or. L. Rev. 27 (1999). However, *Raytheon* confirmed that *McDonnell Douglas* applies in instances as that before the Court now. *Raytheon,* 540 U.S. at 49.

[35] *Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 255, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981),* involves discrimination under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.* However, where *McDonnell Douglas* applies, it is uniformly construed. *See,* Note: *The Reasonable Accommodation Difference: The Effect of Applying the Burden Shifting Frameworks Developed Under Title VII in Disparate Treatment Cases to Claims Brought Under Title I of the Americans with Disabilities Act,* 18 Berkeley J. Emp. & Lab. L. 143 (1997); Michael J. Zimmer, *Symposium: Employment Discrimination: Symposium Article: The Emerging Uniform Structure Of Disparate Treatment Discrimination Litigation,* 30 Ga. L. Rev. 563 (1996).

*Cir. 1991)*. However, the explanation provided must be legally sufficient, assuming it is believed, to justify a judgment for the defendant. *Burdine, 450 U.S. at 255*. An articulation not admitted into evidence will not suffice, and defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel. *Id. at 256, n. 9*.

Once a defendant articulates a legitimate, nondiscriminatory reason for the employment decision at issue, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination; or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. *Rachid, 376 F.3d at 312*.

A plaintiff relying on circumstantial evidence has the option of (1) offering evidence showing that defendant's proffered nondiscriminatory reasons are false, or (2) offering evidence showing that age was a motivating factor for the defendant's adverse employment decision. *Machinchick, 398 F.3d at 352*. If a plaintiff demonstrates that disability was a motivating factor in the employment decision, the burden shifts to defendant to prove that the same adverse employment decision would have been made regardless of discriminatory animus. *Id*.

As noted above, Defendant may raise the independent issue of undue hardship. Defendant has the burden of proving by a preponderance of the evidence that the accommodation would have imposed an undue hardship.

## 2. Analysis

The Court has not been directed to any evidence that demonstrates disability

discrimination without inference or presumption. *See Washburn v. Harvey,* 504 F.3d 505, 510-511 (5th Cir. 2007)*; Fabela v. Socorro Indep. Sch. Dist., 329 F.3d 409, 415 (5th Cir. 2003)*. Hartup has not put before the Court a statement or document that "shows on its face that an improper criterion served as the basis for an adverse employment action." *Id. at 415; see also Washburn,* 504 F.3d 505, 510-511. This case is not so close as that in *Washburn,* in which the plaintiff swore he had been told he would never be promoted because of his complaints against management. *Id.,* 510. Because it was not clear if the persons speaking had such authority, the Fifth Circuit found the evidence to be circumstantial. *Id. "*Although a plaintiff's testimony may establish retaliation, such testimony is only sufficient if it 'proves the fact of intentional retaliation without inference or presumption.' *Id., citing Fierros v. Tex. Dep't of Health,* 274 F.3d 187, 195 (5th Cir. 2001).

In the instant case, the Court is essentially asked to take note of the oddly disjointed manner in which his termination was handled, the inconsistencies in matters as to when exactly he was terminated, a possible belief that he *had* been disabled at one time, and discern within that evidence an intent to discriminate against him because of a present disability.

With the possible exception of past disability,[36] this evidence requires inference to establish discriminatory intent. As to the possibility that Trane had considered him disabled in the past, receipt of long-term disability benefits provides sustenance to an individual during a period of illness. The legal definition of a disability

---

[36] Hartup contends that Trane considered him disabled in 2006 when it persuaded him to accept FMLA and long-term disability benefits. *See* Hartup Depo at 181:20-182:6, 184:19-185:7, 189:8-21; Smith Depo. 19:18-20; Stewart Aff. ¶ 7. (D. App. 4, 75-79, 130, 219-220); P. Aff., ¶12 (P. App. 303-304); P. App. Ex. 5 (P. App. 263-265).

under the ADA may be different from the eligibility criterion employer disability plans and the Court has not been directed to any evidence that these were substantially similar in the instant case. *See Bennett v. Calabrian Chems. Corp.,* 126 Fed. Appx. 171, 172 (5th Cir. 2005). A past record of such benefits does not prove current ADA disability. *See Bennett v. Calabrian Chems. Corp.,* 126 Fed. Appx. 171, 171-172 (5th Cir. 2005*); Pryor v. Trane Co.,* 138 F.3d 1024,1026 (5th Cir. 1998); *EEOC v. Mother's Work,* 2006 WL 1280940, *7 (W.D. Tex. 2006); *Wright v. FMC Technologies, Inc.,* 2005 WL 1607454, *5 (S.D. Tex. 2005).

Besides, Trane has offered a significant reason why it would not want to bring him back on board as a salesman. Michael Thoele, his supervisor, testified in deposition that his performance was mediocre and his commission earnings rarely exceeded his draw. Theole Depo. 30:23 – 31:1; 33:1-11; 41:21-25; 43: 9-20; 45:21-46:1 (D. App. at 203-209). In other words, having Hartup work for Trane actually cost it money out of pocket. *Id.*

As the Court has not been directed to any direct evidence of retaliation or retaliatory intent, the *McDonnell-Douglas* burden-shifting paradigm necessarily applies. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Hartup must therefore first establish a prima facie case of retaliation, demonstrating that (1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) that there is a causal link between the protected activity and the adverse action. *McDonnell Douglas,* 411 U.S. at 802-04; *Raggs v. Miss. Power & Light Co..,* 278 F.3d 463, 471 (5th Cir. 2004); *Gee v. Principi,* 289 F.3d 342, 345 (5th Cir. 2002).

If he meets this burden, Trane must then articulate a "legitimate, non-

discriminatory reason(s)" for the adverse action it took. *Rios, 252 F.3d at 378*. If Trane meets this burden, Hartup must then offer sufficient evidence to create a genuine issue of material fact either (1) that defendant's reason is not true, but is instead a pretext for discrimination; or (2) that defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. *Rachid v. Jack In the Box, 376 F.3d 305, 312 (5th Cir. 2004)*.

It is clear to the Court that Hartup engaged in protected activity when requesting a reasonable accommodation. However Trane's reaction is characterized, whether termination or refusal to hire, it was unquestionably an adverse employment action. In November, 2007, Trane ultimately settled on this as a termination, P. Aff., ¶ 28 (P. App. 308), and the Court will accept that, inasmuch as it does not prejudice either party.

The issue is then whether a discriminatory causal link existed between the request for accommodation and the termination.[37] Hartup would have the Court find it within the extensive history between the parties that left Trane intimately acquainted with his health issues.

The Court presumes a causal link may be inferred without necessarily finding it, as the matter may be resolved conclusively further along the *McDonnell-Douglas* ladder. Recent case law has demonstrated this to be a prudent course. The burden thus shifts to Trane to advance a legitimate, non-retaliatory reason for the termination.

Trane's termination letter itself stated the reason succinctly: "Since it ap-

---

[37] Obviously, the reaction followed from the request: the issue, however, is discriminatory intent.

pears you cannot perform your job, your employment with the Company will be terminated effective December 5, 2007." P. App. 290 (P. Exh. 18). While the date varies in the evidence, the reason given is consistent throughout: Trane maintains that the nature of the indoor sales position had changed in a way that disqualified him from performing it. This is a lawfully neutral reason for the termination, which requires Hartup to produce evidence that this is a pretext for retaliation. *Sherrod*, 132 F.3d at 1123; *Penny*, 128 F.3d at 417.  That is particularly true given Hartup's mediocre performance on the job. *See* Theole Depo. 30:23 – 31:1; 33:1-11; 41:21-25; 43: 9-20; 45:21-46:1 (D. App. at 203-209), and the record of abundant, past accommodations made by Trane when business circumstances allowed it.

Hartup does not produce evidence of pretext. Hartup does not dispute that he would in some degree burden his co-workers, but characterizes the creation of a niche job as an accommodation for disability, not mere limitations. Hartup makes "no reference to any negative or offensive comments related to his [physical limitations], to a pattern of discrimination against the disabled … or indeed to any other negative encounter at [Trane] related to his [physical limitations] in the four years he worked there.  *See, e.g., Edwards v Wal-Mart Stores, Inc.,* 2001 WL 43546, *4 (5th Cir. January 8, 2001).[38]

Accordingly, the Court finds that Hartup has not directed it to evidence sufficient to sustain his claim for retaliation resulting from his assertion of disability rights.

---

[38]   The Court cites *Edwards* solely for the language quoted regarding the sort of evidence required for this phase, and not in reliance or recourse to the "same actor" inference referenced later in that passage.

**V.**    **CONCLUSION**

In sum, Plaintiff Hartup has not come forward with sufficient evidence to de-feat Defendant's motion for summary judgment. There are no genuine issues of ma-terial fact because Hartup failed to show that he has a disability recognized under the ADA. He did not allege a record of such impairment or that he was "regarded" as disabled in violation of the ADA. Unquestionably, the curious history of Trane's dis-engagement from Hartup is troubling. But the Court notes that the only basis of Har-tup's claim is the ADA, and not, for example, a violation of the FMLA.

Accordingly, Defendant's Motion for Summary Judgment is **GRANTED.**

So **ORDERED** this 31st day of August, 2009.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**